John DILLARD, et al., Plaintiffs,

v.

CITY OF GREENSBORO, Defendant.

Civ. A. No. 87–T–1223–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 11, 1994.

James U. Blacksher, Birmingham, AL, Julius L. Chambers, Scherlyn Ifill, NAACP Legal Defense Fund, New York City, Edward Still, Birmingham, AL, for plaintiffs.

Richard H. Gill, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, Nicholas H. Cobbs, Jr., Greensboro, AL, David R. Boyd, Balch & Bingham, Montgomery, AL, Mortimer Parker Ames, III, James H. Evans, Office of the Atty. Gen., Montgomery, AL, for defendant.

### MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

The plaintiffs brought this lawsuit against defendant City of Greensboro, Alabama almost seven years ago, claiming that the at-large system used to elect the Greensboro City Council violated § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973. The plaintiffs sued on behalf of themselves and all other African–American citizens in the city. They alleged that, under the at-large system, "the political processes ... are not equally open to participation by [them] ... in that [they] have less opportunity than other members of the electorate to

participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973. The jurisdiction of the court has been properly invoked pursuant to 28 U.S.C.A. §§ 1331, 1343(3) and 42 U.S.C.A. § 1971(d).[1]

The city did not contest that its at-large system violated § 2. Thus the only question now before the court is what redistricting plan should be implemented for the city council to remedy the violation. The special master in this case, United States Magistrate Judge John L. Carroll, has recommended that the court adopt the plaintiffs' proposed single-member district plan and order immediate new elections. For the reasons that follow, the court concludes that the magistrate judge's recommendation should be adopted.

## I. BACKGROUND

The City of Greensboro is located in Hale County in western Alabama. According to the 1990 census, the city has a total population of 3,047. Blacks comprise 62% of the population and 56% of the voting age population. At one time, the city elected its councilmembers by at-large elections.

In 1987, in response to this lawsuit, the City of Greensboro conceded that its at-large system violated § 2 of the Voting Rights Act.[2] To remedy this violation, the court, on the recommendations of the magistrate judge,[3] adopted a single-member districting plan proposed by the city.[4] Because the city's plan was legislative and thus had to be "precleared" pursuant to § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c,[5] *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), the court allowed the city to use the plan on an interim basis only.[6] *See Upham v. Seamon*, 456 U.S. 37, 43–44, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982) (per curiam); *Burton v. Hobbie*, 561 F.Supp. 1029, 1036 (M.D.Ala. 1983) (three-judge court). The 1992 municipal elections were conducted pursuant to this interim plan. The 1992 plan had five districts; in three of them, African–Americans were a majority of the voting age population.[7] District 1 contained a black voting age population of 83%; District 2 contained a black voting age population of 58%; and District 3 contained a black voting age population of 75%. Districts 1 and 3 elected black councilmembers in 1992, and District 2 elected a white candidate over a black candidate.

Subsequently, in December 1992, pursuant to § 5 of the Voting Rights Act, the United States Attorney General refused to preclear, and interposed an objection to, the 1992 plan. The Attorney General concluded that the 1992 plan improperly "fragmented black population concentrations in order to *lower* the black percentage in District 2."[8] *See Buskey v. Oliver*, 565 F.Supp. 1473, 1483 (M.D.Ala.1983) (§ 2 violation established where city decreased black population in district for racially discriminatory purpose). The Attorney General noted that "a black-supported candidate in District 2 was defeated."[9]

---

1. This lawsuit is one of many *Dillard* cases that have been before the court challenging at-large election systems across Alabama. The court traced the evolution of these cases in some detail in *Dillard v. Baldwin County Bd. of Educ.*, 686 F.Supp. 1459, 1461 (M.D.Ala.1988).

2. Defendant's selection of "subclass b" option filed on August 12, 1987.

3. Recommendations of the magistrate judge entered on July 2, 1992, and February 11, 1993.

4. Orders of July 13, 1992, and March 2, 1993.

5. Section 5 of the Voting Rights Act provides that a covered jurisdiction shall not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," without first obtaining preclearance from the federal government. 42 U.S.C.A. § 1973c.

6. Order of July 13, 1992.

7. In these three districts, blacks were also a majority of the total population. In analyzing this and other plans, the court does not decide which population base is most appropriate but uses voting age population figures throughout for the sake of comparison.

8. Letter from the United States Attorney General, dated December 4, 1992, and filed with the court on January 4, 1993, at 2 (emphasis added).

9. *Id.*

In January 1993, in response to the Attorney General's decision, the plaintiffs filed a motion for further relief asking the magistrate judge to recommend approving a plan previously submitted by the plaintiffs on December 11, 1991.[10] The city responded by asking for additional time to fashion a new plan.[11] The magistrate judge agreed, and the city adopted a new plan in August 1993.[12] The 1993 plan created three majority-black districts. District 1 contained a black voting age population of 83%; District 2 contained a black voting age population of 63%; and District 3 contained a black voting age population of 73%. The city submitted the 1993 plan to the Attorney General for preclearance. Once again, the Attorney General interposed an objection under § 5. Although District 2's black voting age population had been increased from 58% to 63%, the Attorney General found that the 1993 plan still improperly hindered African–Americans from electing candidates of their choice.[13] First, she observed that the black voting majority in District 2 was still insufficient in light of, among other factors, "the reduced electoral participation of black persons, which is traceable to a history of discrimination."[14] Second, she concluded that the city's actions appeared to have been "calculated to limit black voting strength."[15] She explained that the city "has provided no satisfactory explanation for limiting black electoral opportunities in this manner," in view of the fact that "the city was aware of several alternative plans ... in which black voters constituted a greater majority of the voting age population" in District 2.[16]

Subsequently, in January 1994, the plaintiffs filed a renewed motion for further relief, once again asking the magistrate judge to recommend adopting their plan.[17] The city requested that the magistrate judge himself draw a new plan. The city also requested that the current members of the city council be allowed to serve their full terms. In May 1994, the magistrate judge issued a recommendation that the court adopt the plaintiffs' plan and order immediate elections.[18] The city objected to the magistrate judge's recommendation and requested that the court itself draft a plan, noting that a court-ordered plan would not be subject to § 5 preclearance. In June 1994, the city attorney submitted to the court a plan that slightly modified the city's 1993 plan as an example of how the court could design its own plan in a way that would better comply with the city's districting preferences than did the plaintiffs' plan, but still provide a reasonable opportunity to elect a minority-preferred candidate.[19] This 1994 proposed plan was not to the court's knowledge adopted by the city.

## II. DISCUSSION

The Attorney General has objected to the city's 1992 and 1993 plans. For this reason, the court cannot allow further elections to be held under either of these plans. *Clark v. Roemer,* 500 U.S. 646, 652–55, 111 S.Ct. 2096, 2101–02, 114 L.Ed.2d 691 (1991). Therefore, the court is presented with three options. First, the court could adopt the plaintiffs' plan. Second, the court could

---

10. Plaintiffs' motion for further relief filed on January 14, 1993.

11. Defendant's motion for continuance filed on July 7, 1993.

12. United States Magistrate Judge's Order of July 9, 1993.

13. Letter from the United States Attorney General, dated January 3, 1994, and filed with the court on January 6, 1994, at 2.

14. *Id.* More specifically, she explained that, "While the plan provides for slight increases in the black population percentages in District 2, the opportunity for black voters to elect a representative of their choice in that district appears to have been constrained deliberately, taking into

account the continued fragmentation of black population concentrations, the pattern of racially polarized voting and the reduced electoral participation by black persons, which is traceable to a history of discrimination." *Id.*

15. *Id.*

16. *Id.*

17. Plaintiffs' renewed motion for further relief filed on January 6, 1994.

18. Recommendation of the magistrate judge entered on May 16, 1994.

19. Defendant's letter filed on June 14, 1994.

adopt the 1994 proposed plan submitted by the city attorney. And third, the court could draw its own plan. In deciding which of these options to take, the court is aware that redistricting is first and foremost a legislative decision. *E.g., White v. Weiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973). Moreover, although the court does not have before it a plan adopted by the city and acceptable to the Attorney General, the court still must show deference to the city's legislative concerns and policies to the extent they can be identified. *Id.* at 795–96, 93 S.Ct. at 2355. The court thus has a responsibility to choose a valid plan that most closely approximates the city's preferences. In deferring to legislative policy, however, the court must ensure that federal constitutional and statutory requirements are met. *Upham v. Seamon,* 456 U.S. 37, 42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982) (per curiam). Therefore, any plan adopted must specifically remedy the objections of the Attorney General. *See id.* at 40–41, 43, 102 S.Ct. at 1521, 1522.

## A.

■ The court begins by examining how each of the three options would address the Attorney General's concerns. The plaintiffs' plan has three majority-black districts containing black voting age populations of 85%, 80%, and 76%. Although District 2 in both of the city's plans had a majority black voting age population, the Attorney General still refused to preclear the district, noting the following in regard to the 1993 plan: first, the majority was insufficient in light of "the reduced electoral participation by black persons, which is traceable to a history of discrimination"; [20] and, second, it appeared that the city had deliberately "limit[ed] black voting strength." [21] When the Attorney General refused to approve the city's two plans, there was no objection to districts that had black voting age populations of 73% and 75%. Because the plaintiffs' plan has three districts with black voting age populations above the

percentages the Attorney General found acceptable, the court believes that the plaintiffs' plan will serve as a complete remedy to black vote dilution and will allow African–Americans to elect candidates of their choice. The court also finds no evidence that the plaintiffs' plan is a product of a deliberate attempt to limit black voting strength. Finally, none of the parties has suggested that the plaintiffs' plan does not fully redress the Attorney General's concerns.

The 1994 proposed plan suggested by the city attorney does not reasonably provide this assurance. To be sure, it creates three majority-black districts. District 1 has a black voting age population of 83%; District 2 has a black voting age population of 66%; and District 3 has a black voting age population of 73%. In addition, District 2 has a black voting age population that is 3.5% greater than the 1993 plan to which the Attorney General objected. However, because the city attorney submitted this plan after the recommendation of the magistrate judge, the court has before it virtually no evidence as to whether this marginal increase is sufficient in light of the Attorney General's findings of reduced electoral participation by black persons brought on by racial discrimination. Moreover, the criticism the Attorney General leveled at the 1993 plan can also be leveled at the city attorney's 1994 proposed plan. Given that "the city was aware of several alternative plans ... in which black voters constituted a greater majority of the voting age population" in District 2, the city has offered "no satisfactory explanation for limiting black electoral opportunities in [the] manner" that it did.[22] This criticism takes on more significance in view of the Attorney General's concern that the city had "deliberately" constrained black voting strength in District 2.[23] Finally, the city attorney has not explained why he did not submit a new plan until after the magistrate judge had held an evidentiary hearing and had submitted his recommendation. At some point, this seven-year old case must

---

20. Letter from the United States Attorney General, dated January 3, 1994, and filed with the court on January 6, 1994, at 2.

21. *Id.*

22. *Id.*

23. *Id.*

come to an end. For all these reasons separately and together, the court concludes that it cannot adopt the city attorney's plan.

Admittedly, the city is not necessarily advocating that the particular districts in the city attorney's 1994 plan be adopted. Instead, the city uses that plan as an example of how the court itself could fashion districts that have sufficient black voting strength to meet the Attorney General's concerns but are still close to the city's preferred districts. Assuming that such a task is possible, the court finds the city's invitation to draw a new plan to be an undesirable option. The court does not have sufficient evidence before it to draw up its own plan. For instance, the court would need to know where incumbents lived. *Buskey v. Oliver*, 574 F.Supp. 41, 43 (M.D.Ala.1983). The court would also need evidence regarding how the city is divided into communities of interest. *Wesch v. Hunt*, 785 F.Supp. 1491, 1498 (S.D.Ala.) (three-judge court), *aff'd mem.*, —— U.S. ——, 112 S.Ct. 1926, 118 L.Ed.2d 535 (1992). And finally, of course, if the plan drafted by the court included a majority black voting age population district with a population that fell below the populations previously approved by the Attorney General, the court would have to be concerned as to whether the population is still sufficient in light of reduced electoral participation by black persons brought on by racial discrimination. The court does not have before it sufficient evidence to address these concerns.

In any event, if there is a plan that plainly resolves the Attorney General's objections without as great a departure from the city's preferred districts as the plaintiffs' plan, the city itself should have submitted it to the court and preferably should have submitted it to the magistrate judge while this case was pending before him. The court understands its responsibility to defer to legislative preferences, but that responsibility is not determinative where the city has had ample opportunity—indeed, three to four years since the 1990 census—to present a plan that meets the Attorney General's objections, has failed to do so, and then demands a further delay while the court takes on the city's responsibility. *Cf. United States v. Dallas County Comm'n*, 850 F.2d 1433, 1442 (11th Cir.1988) (opinion of Hatchett, J.) (where governmental entity has had ample time to fashion acceptable districting plan under § 2 but has failed to do so "through preclearance defaults and litigation plans," court was not required to give it another opportunity), *cert. denied*, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989).[24]

## B.

Notwithstanding its preference to avoid drawing a new plan, the court would have to undertake that task if the plan proposed by the plaintiffs was invalid for some reason. The court finds, however, that the plaintiffs' plan does not violate constitutional or statutory standards. The plan meets the one-person, one-vote requirement of the fourteenth amendment to the United States Constitution. In regard to statutory standards, the Eleventh Circuit Court of Appeals has held that "any proposal to remedy a Section 2 violation must itself conform with Section 2." *Dillard v. Crenshaw County*, 831 F.2d 246, 249 (11th Cir.1987). Section 2 requires a complete remedy for dilution of minority voting strength and an equal opportunity for minorities to participate in the political process and elect candidates of their choice. *Id.* at 250.

---

**24.** In suggesting that the court draft a plan that meets the city's preferences, the city attorney noted that, although a governmentally enacted plan would be subject to preclearance under § 5, *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), a court-ordered plan would not. *Wesch*, 785 F.Supp. at 1498. This suggestion could be viewed, although perhaps unintended, as an effort to dodge this requirement. Section 5 is an "extraordinary" preventive measure. *Presley v. Etowah County Com'n*, 502 U.S. 491, ——, 112 S.Ct. 820, 827, 117 L.Ed.2d 51 (1992). It is a "congressional response to the unremitting attempts by some state and local officials to frustrate their citizens' equal enjoyment of the right to vote." *Id.* A trial court should therefore be circumspect of any attempt, intended or not, to place upon the court the responsibility of drafting a plan that essentially and fully reflects a covered jurisdiction's legislative preferences when there is no plausible reason as to why the jurisdiction did not itself adopt the plan. In other words, a court should be careful not to allow itself to be used as a tool to undermine the laudatory and important national purpose behind § 5.

African–Americans comprise a majority of Greensboro's population. Although § 2 does not require proportional representation, absent discrimination it would be expected that blacks would be able to elect candidates of their choice to a majority of the five council seats. The city appears to recognize this because both its 1992 and 1993 plans had three majority-black districts. The plaintiffs' plan likewise contains three majority-black districts. Unlike the city's plans, however, the plaintiffs' plan does everything reasonably possible to maximize black voting strength. If the plaintiffs' plan does not conform to § 2 in providing a complete remedy for minority vote dilution and an equal opportunity for minorities to elect candidates of their choice, it is hard to know what would.

The city, however, objects that the plaintiffs' plan goes beyond what is necessary to remedy the § 2 violation. The city does not appear to object to having three majority-black districts. Rather, the city objects to the plaintiffs' plan because it places too many blacks in each of the three majority-black districts, enhancing black voting strength beyond what is required by § 2. Yet the city's 1992 plan had districts with black voting age populations of 83% and 75%; the 1993 plan had districts with black voting age populations of 83% and 73%. Given the city's approval of districts with 83% black voting age populations, its objection to the plaintiffs' districts seems disingenuous. Even so, ordinarily the court would take seriously concerns about packing minorities into districts. Section 2 does not set any absolute floor below which the percentage of blacks in a majority-black district may not fall, nor does it require that the percentage be maximized. In this situation, however, the Attorney General objected to a district with a black voting age population of 63% because of, among other factors, "the reduced electoral participation by black persons, which is traceable to a history of discrimination";[25] therefore, any plan the court adopts to cure that objection will necessarily contain districts with a great many blacks. In this context, concerns

about packing are less substantial. Additionally, blacks are not complaining that they have been packed into some districts in order to dilute their voting strength in other districts. Finally, even assuming that the plaintiffs' plan goes beyond what is required by § 2, the question remains whether any law or standard has been violated as a result. Finding none, the court is unwilling to hold that the districts are improper.

In response to another objection by the city, the court notes that it does not base its decision to adopt the plaintiffs' plan on a finding that the Voting Rights Act can only be complied with if black voters choose black candidates. The purpose of § 2 of the Voting Rights Act is not to assure the election of black candidates. Admittedly, in objecting to the city's proposed plans, the Attorney General included evidence that, under the city's 1992 plan, a "black-supported candidate in District 2 was defeated."[26] The Attorney General was not saying, however, that it was significant that a "black" candidate had been defeated but rather that a "black-supported" one had. In other words, what was significant was not the race of the candidate but whether, in light of past discrimination against blacks, he was the choice of black voters. Although this should not be the solely determinative factor, it was a proper consideration—after all, to establish a § 2 violation, the plaintiffs must show that, in light of "the totality of the circumstances, ... the political processes ... are not equally open to participation by [them] ... in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973.

The city also objects to a number of the magistrate judge's findings that suggest a § 2 violation exists in Greensboro. Because the city has admitted to a § 2 violation and because the court agrees with these findings, the city's objections are without merit.

25. Letter from the United States Attorney General, dated January 3, 1994, and filed with the court on January 6, 1994, at 2.

26. Letter from the United States Attorney General, dated December 4, 1992, and filed with the court on January 4, 1993, at 2.

## C.

■ The court has found that the plan proposed by the plaintiffs cures the Attorney General's objections and does not violate constitutional or statutory law. The city nevertheless asks the court to postpone use of the plaintiffs' plan until the next scheduled election. The court will not delay implementation of the plan. First, for over two years, the councilmembers currently elected have been serving under a plan that violates § 5; this is two years too long. *See Clark v. Roemer,* 500 U.S. 646, 652–55, 111 S.Ct. 2096, 2101–02, 114 L.Ed.2d 691 (1991). Second, when they ran for their seats in 1992, the councilmembers knew that the court had ordered only an interim plan. Cutting their terms short, therefore, should not violate any expectations. *See Burton v. Hobbie,* 561 F.Supp. 1029, 1034–35 (M.D.Ala.1983) (three-judge court) (where court gave "[c]lear and unequivocal notice ... to members of the Legislature and the public that the 1982 elections were for a one-year term," "[i]ncumbent legislators ... ha[d] no legal or moral right to complain that their terms are being foreshortened"). The court also declines to postpone elections under a valid districting plan on the chance that the city will appeal. If the city decides to appeal this decision it can move for a stay. A special election should therefore be held as soon as possible and the winners of that election should be seated shortly after the election results are declared.

Nevertheless, because the court is unfamiliar with local conditions in Greensboro, it is not now in a position to set particular dates for elections or for the winners to take office. The parties will therefore be given 14 days to agree upon and submit to the court a comprehensive election schedule. If the parties fail to reach an agreement within that time, each shall submit to the court a proposed election schedule within 17 days of the date of this opinion, and the court itself will adopt a schedule forthwith.

## III. CONCLUSION

In conclusion, after examining the two plans before the court, deciding whether to draw a plan itself, and considering the city's objections to the magistrate judge's recommendation, the court adopts the plaintiffs' plan and orders a special election to take place as soon as possible.

An appropriate judgment and injunction will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the plaintiffs' motion for further relief filed on January 14, 1993 and renewed on January 6, 1994 is granted;

(2) That defendant City of Greensboro's objections to the recommendation of the United States Magistrate Judge, entered on May 16, 1994, are overruled;

(3) That it is DECLARED that the districting plan filed by the plaintiffs on December 11, 1991, a copy of which is attached, does not violate the "one-person, one-vote" principles of the fourteenth amendment or the "vote dilution" principles of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973;

(4) That the court approves and adopts the districting plan filed by the plaintiffs on December 11, 1991; and

(5) That defendant City of Greensboro, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are each RESTRAINED and ENJOINED:

(A) From using the current districting system for the Greensboro City Council in any future elections;

(B) From failing to implement and use the districting plan filed by the plaintiffs on December 11, 1991; and

(C) From failing to hold a special election under said plan according to a schedule to be adopted by the court at a later time.

It is further ORDERED:

(1) That the plaintiffs and defendant City of Greensboro are given 14 days from the date of this judgment and injunction to agree

upon and file with the court a comprehensive schedule for a special election; and

(2) That, if the plaintiffs and defendant City of Greensboro are unable to agree on a schedule for the special election, each party is to submit a proposed election schedule to the court within 17 days from the date of this judgment and injunction.

It is further ORDERED that the plaintiffs have and recover from defendant City of Greensboro their reasonable attorney's fees and expenses, and that the plaintiffs are allowed until November 11, 1994, to file their request for attorney's fees and expenses.

It is further ORDERED that costs are taxed against defendant City of Greensboro, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.

Greenboro City,Hale County,Alabama: A 5-SMD City Council Plan Summary Report

TOTAL POP       : 3047
NUMBER OF SEATS: 5
IDEAL SIZE      : 609.40

| DISTRICT NUMBER | TOTAL POP | TOTAL VAP | PERCENT DEVIATION | BLACK POP | PERCENT BLACK | BLACK VAP | % VAP BLACK | WHITE POP | PERCENT WHITE | WHITE VAP | % VAP WHITE | HISP POP | PERCENT HISP | HISP VAP | % VAP HISP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 616 | 392 | 1.14 | 550 | 89.29% | 333 | 84.95% | 65 | 10.55% | 59 | 15.05% | 0 | 0.00% | 0 | 0.00% |
| 2 | 630 | 421 | 3.44 | 523 | 83.02% | 335 | 79.57% | 107 | 16.98% | 86 | 20.43% | 0 | 0.00% | 0 | 0.00% |
| 3 | 592 | 453 | -2.81 | 67 | 11.32% | 53 | 11.70% | 523 | 88.34% | 399 | 88.08% | 0 | 0.00% | 0 | 0.00% |
| 4 | 612 | 443 | 0.49 | 281 | 45.92% | 162 | 36.57% | 326 | 53.27% | 277 | 62.53% | 5 | 0.82% | 1 | 0.23% |
| 5 | 597 | 405 | -1.97 | 482 | 80.74% | 308 | 76.43% | 115 | 19.26% | 95 | 23.57% | 9 | 1.51% | 7 | 1.74% |
|  | 3047 | 2112 |  | 1903 | 62.45% | 1191 | 56.39% | 1136 | 37.28% | 916 | 43.37% | 14 | 0.46% | 8 | 0.38% |

Note:  The above percent deviation is based on an ideal district size of 609.  The actual deviations are D1 - 0.0114942; D2 - 0.0344827; D3 - 0.0279146; D4 - 0.0049261; D5 - 0.0197044

DISTRICT # 1 PAGE: 1

CTY TOTAL = 0   CTY WHITE = 0   CTY BLACK = 0   CTY HISP = 0   CTY TVAP = 0   CTY BVAP = 0   CTY WVAP = 0   CTY HVAP = 0

| PLACE | TRACT | BG | BLOCK | TOTAL | TVAP | BLACK | BVAP | WHITE | WVAP | HISP | HVAP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 1 | 102A | 56 | 47 | 5 | 2 | 50 | 45 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 404A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 405A | 36 | 23 | 29 | 17 | 7 | 6 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 407A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 408 | 5 | 3 | 4 | 2 | 1 | 1 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 430 | 89 | 57 | 87 | 55 | 2 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 431A | 126 | 61 | 125 | 60 | 1 | 1 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 433A | 136 | 89 | 136 | 89 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 434 | 55 | 35 | 55 | 35 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 435A | 20 | 16 | 18 | 14 | 2 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 436A | 16 | 8 | 14 | 6 | 2 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 437 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 446A | 77 | 53 | 77 | 53 | 0 | 0 | 0 | 0 |

CTY TOTAL = 616   CTY WHITE = 65   CTY BLACK = 550   CTY HISP = 0   CTY TVAP = 392   CTY WVAP = 59   CTY BVAP = 333   CTY HVAP = 0

PERCENT DEVIATION = 1.14

DISTRICT TOTAL = 616   DISTRICT WHITE = 65   ( 10.55%)   DISTRICT BLACK = 550   ( 89.29%)   DISTRICT HISP = 0   ( 0.00%)

DISTRICT TVAP = 392   DISTRICT WVAP = 59   ( 15.05%)   DISTRICT BVAP = 333   ( 84.95%)   DISTRICT HVAP = 0   ( 0.00%)

DISTRICT # 2 PAGE: 1

CTY TOTAL = 0  CTY WHITE = 0  CTY BLACK = 0  CTY HISP = 0  CTY TVAP = 0  CTY WVAP = 0  CTY BVAP = 0  CTY HVAP = 0

| PLACE | TRACT | BG | BLOCK | TOTAL | TVAP | BLACK | BVAP | WHITE | WVAP | HISP | HVAP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 102B | 82 | 52 | 75 | 45 | 7 | 7 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 106 | 78 | 48 | 72 | 42 | 6 | 6 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 107 | 164 | 103 | 150 | 91 | 14 | 12 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 108 | 37 | 19 | 37 | 19 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 109 | 65 | 45 | 57 | 40 | 8 | 5 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 110A | 21 | 17 | 16 | 13 | 5 | 4 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 1 | 103A | 4 | 3 | 4 | 3 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 205A | 94 | 72 | 63 | 48 | 31 | 24 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 206 | 13 | 10 | 0 | 0 | 13 | 10 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 207 | 72 | 52 | 49 | 34 | 23 | 18 | 0 | 0 |

CTY TOTAL = 630  CTY WHITE = 107  CTY BLACK = 523  CTY HISP = 0  CTY TVAP = 421  CTY WVAP = 86  CTY BVAP = 335  CTY HVAP = 0

PERCENT DEVIATION = 3.44

DISTRICT TOTAL = 630  DISTRICT WHITE = 107 ( 16.98%)  DISTRICT BLACK = 523 ( 83.02%)  DISTRICT HISP = 0 ( 0.00%)
DISTRICT TVAP = 421  DISTRICT WVAP = 86 ( 20.43%)  DISTRICT BVAP = 335 ( 79.57%)  DISTRICT HVAP = 0 ( 0.00%)

DISTRICT # 3 PAGE: 1

CTY TOTAL = 0   CTY WHITE = 0   CTY BLACK = 0   CTY HISP = 0   CTY TVAP = 0   CTY WVAP = 0   CTY BVAP = 0   CTY HVAP = 0

| PLACE | TRACT | BG | BLOCK | TOTAL | TVAP | BLACK | BVAP | WHITE | WVAP | HISP | HVAP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 1 | 111 | 5 | 4 | 0 | 0 | 5 | 4 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 1 | 112 | 5 | 4 | 3 | 2 | 2 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 1 | 113 | 7 | 7 | 7 | 7 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 1 | 114 | 4 | 2 | 0 | 0 | 4 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 3 | 318 | 28 | 24 | 0 | 0 | 28 | 24 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 3 | 319A | 19 | 15 | 0 | 0 | 19 | 15 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 409 | 20 | 16 | 0 | 0 | 20 | 16 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 410 | 4 | 4 | 0 | 0 | 4 | 4 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 411 | 13 | 7 | 0 | 0 | 13 | 7 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 412 | 13 | 8 | 0 | 0 | 13 | 8 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 413 | 3 | 3 | 0 | 0 | 3 | 3 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 414 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 415 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 421 | 2 | 2 | 0 | 0 | 2 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 422 | 13 | 11 | 0 | 0 | 13 | 11 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 423 | 29 | 20 | 0 | 0 | 29 | 20 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 424 | 13 | 13 | 0 | 0 | 13 | 13 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 425 | 10 | 9 | 3 | 3 | 6 | 6 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 426 | 3 | 3 | 0 | 0 | 3 | 3 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 427 | 24 | 13 | 0 | 0 | 24 | 13 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 428 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 429 | 25 | 18 | 3 | 3 | 22 | 15 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 438A | 81 | 57 | 0 | 0 | 81 | 57 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 439A | 97 | 77 | 11 | 4 | 86 | 73 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 440 | 10 | 10 | 0 | 0 | 10 | 10 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 441 | 12 | 10 | 0 | 0 | 12 | 10 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 217 | 17 | 15 | 2 | 2 | 15 | 13 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 218 | 37 | 27 | 0 | 0 | 37 | 27 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 219 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 220 | 2 | 2 | 2 | 2 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 221 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 2 | 222 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 3 | 310 | 30 | 18 | 0 | 0 | 30 | 18 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 416 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 417 | 3 | 2 | 3 | 2 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 418 | 2 | 2 | 0 | 0 | 2 | 2 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 419 | 32 | 32 | 25 | 25 | 6 | 6 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. 0785 | 9747 | 4 | 420 | 28 | 17 | 8 | 3 | 20 | 14 | 0 | 0 |

CTY TOTAL = 592   CTY WHITE = 523   CTY BLACK = 67   CTY HISP = 0   CTY TVAP = 453   CTY WVAP = 399   CTY BVAP = 53   CTY HVAP = 0

PERCENT DEVIATION = 2.81

| | | | | |
|---|---|---|---|---|
| DISTRICT TOTAL = | 592 | DISTRICT WHITE = | 523 ( 88.34%) | DISTRICT BLACK = | 67 ( 11.32%) | DISTRICT HISP = | 0 ( 0.00%) |
| DISTRICT TVAP = | 453 | DISTRICT WVAP = | 399 ( 88.08%) | DISTRICT BVAP = | 53 ( 11.70%) | DISTRICT HVAP = | 0 ( 0.00%) |

DISTRICT # 4 PAGE: 1

| PLACE | TRACT | BG | BLOCK | TOTAL | TVAP | BLACK | BVAP | WHITE | WVAP | HISP | HVAP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CTY TOTAL = 0 | CTY WHITE = 0 | CTY BLACK = 0 | CTY HISP = 0 | CTY TVAP = 0 | | CTY WVAP = 0 | CTY BVAP = 0 | | CTY HVAP = 0 | | |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 302A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 302B | 30 | 24 | 0 | 0 | 30 | 24 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 315 | 10 | 10 | 0 | 0 | 10 | 10 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 316 | 11 | 8 | 0 | 0 | 11 | 8 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 317 | 8 | 7 | 0 | 0 | 8 | 7 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 320A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 2 | 227A | 176 | 113 | 120 | 60 | 54 | 52 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 2 | 228A | 100 | 42 | 95 | 39 | 5 | 3 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 301A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 304A | 28 | 22 | 9 | 6 | 19 | 16 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 305 | 24 | 21 | 0 | 0 | 22 | 19 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 308 | 12 | 10 | 0 | 0 | 12 | 10 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 309 | 14 | 12 | 0 | 0 | 14 | 12 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 311 | 33 | 28 | 0 | 0 | 33 | 28 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 312 | 18 | 12 | 0 | 0 | 18 | 12 | 5 | 1 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 313 | 114 | 110 | 57 | 57 | 57 | 53 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 3 | 314 | 34 | 24 | 0 | 0 | 33 | 23 | 0 | 0 |
| CTY TOTAL = 612 | CTY WHITE = 326 | CTY BLACK = 281 | CTY HISP = 5 | CTY TVAP = 443 | | CTY WVAP = 277 | CTY BVAP = 162 | | CTY HVAP = 1 | | |

PERCENT DEVIATION = 4.92

DISTRICT TOTAL =   612   DISTRICT WHITE =   326   ( 53.27%)   DISTRICT BLACK =   281   ( 45.92%)   DISTRICT HISP =   5   ( 0.82%)

DISTRICT TVAP =   443   DISTRICT WVAP =   277   ( 62.53%)   DISTRICT BVAP =   162   ( 36.57%)   DISTRICT HVAP =   1   ( 0.23%)

DISTRICT # 5 PAGE: 1

CTY TOTAL = 0   CTY WHITE = 0   CTY BLACK = 0   CTY HISP = 0   CTY TVAP = 0   CTY WVAP = 0   CTY BVAP = 0   CTY HVAP = 0

| PLACE | TRACT | BG | BLOCK | TOTAL | TVAP | BLACK | BVAP | WHITE | WVAP | HISP | HVAP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 201A | 297 | 191 | 283 | 178 | 14 | 13 | 7 | 5 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 202 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 208 | 8 | 8 | 8 | 8 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 209 | 56 | 44 | 38 | 27 | 18 | 17 | 2 | 2 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 210 | 3 | 3 | 3 | 3 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 211 | 2 | 2 | 2 | 2 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 212 | 3 | 3 | 3 | 3 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 213 | 26 | 20 | 26 | 20 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 214 | 25 | 19 | 21 | 16 | 4 | 3 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 215 | 63 | 33 | 63 | 33 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 216 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 223 | 11 | 10 | 0 | 0 | 11 | 10 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 224 | 21 | 11 | 0 | 0 | 21 | 11 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 2 | 225A | 35 | 18 | 35 | 18 | 0 | 0 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 3 | 306 | 18 | 17 | 0 | 0 | 18 | 17 | 0 | 0 |
| Hale Count 005 Greensboro city (pt. | 0785 | 9747 | 3 | 307 | 29 | 24 | 0 | 0 | 29 | 24 | 0 | 0 |

CTY TOTAL = 597   CTY WHITE = 115   CTY BLACK = 482   CTY HISP = 9   CTY TVAP = 403   CTY WVAP = 95   CTY BVAP = 308   CTY HVAP = 7

PERCENT DEVIATION = 1.97

| DISTRICT TOTAL = | 597 | DISTRICT WHITE = | 115 | ( 19.26%) | DISTRICT BLACK = | 482 | ( 80.74%) | DISTRICT HISP = | 9 | ( 1.51%) |
| DISTRICT TVAP = | 403 | DISTRICT WVAP = | 95 | ( 23.57%) | DISTRICT BVAP = | 308 | ( 76.43%) | DISTRICT HVAP = | 7 | ( 1.74%) |